Filed 1/12/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>REMUS SAM LANGI,<br><br>    Defendant and Appellant. | A160262<br><br>(San Mateo County<br>Super. Ct. No. SC054893C) |

Remus Sam Langi appeals the denial of a petition requesting resentencing under Penal Code section 1170.95.[1] This ameliorative statute, enacted as part of Senate Bill No. 1437 (2017–2018 Reg. Sess.), and amended effective January 1, 2022, by Senate Bill No. 775 (2021–2022 Reg. Sess.), authorizes resentencing of persons convicted of murder "under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1170.95, subd. (a), added by Stats. 2018, ch. 1015, § 4, as amended by Stats. 2021, ch. 551, § 2.) In 2007, appellant was convicted of the second degree murder of Miguel Martinez. Appellant was one of four men who beat and robbed a group that included Martinez, who died after someone in appellant's group punched him, causing him to fall and hit his head, leading to his death. Appellant's section 1170.95 petition, filed before the 2021 amendment, contends that another member of his group threw the fatal

---

[1] All statutory references are to the Penal Code.

1

punch and that, although the court at his trial did not give an instruction framed in terms of the natural and probable consequences theory, the instructions were ambiguous and allowed the jury to find him guilty of murder under a theory under which malice was imputed to him based solely on his participation in a crime.

The trial court summarily denied his petition after ruling that this court's 2009 opinion affirming his conviction (*People v. Langi* (Apr. 28, 2009, A119095 [nonpub. opn.]) (*Langi I*)) establishes that he was convicted as the actual killer. In light of subsequent guidance provided by the Supreme Court in *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*), we conclude that the court's reliance on this court's prior opinion was improper, and that the record of conviction does not conclusively eliminate the possibility that the jury found appellant guilty of murder on a theory under which malice was imputed to him based solely on his participation in a crime. We will thus reverse the order summarily denying his petition and remand for an evidentiary hearing.

### Factual and Procedural History

*Langi I* describes the events that led to the death of Miguel Martinez as follows: "Martinez and three other friends . . . were out celebrating the 20th birthday of [another] friend . . . . At around 1:45 or 2:00 a.m. . . . they went to a cul-de-sac in East Palo Alto where they continued drinking and celebrating. [¶] They were . . . approached by appellant, Sione Fakalata, Joe Ngaloafe, and a fourth individual who has never been positively identified. At first, everything was very friendly . . . . [¶] Suddenly, Fakalata punched [one of Martinez's friends] in the face, knocking him down. [He] immediately felt someone going through his pockets. *Appellant then punched Miguel Martinez directly in the face, causing Miguel to fall to the ground, landing on his back, and striking the rear of his head on the sidewalk or curb*. Once [Martinez was]

on the ground, . . . appellant continued to punch and kick [him] in the head and chest area. [¶] . . . [¶] The police arrived and arrested [appellant, Fakalata, and Ngaloafe]. The fourth individual was never found. . . . [¶] *Miguel Martinez never regained consciousness after falling to the ground and hitting his head due to appellant's punch to the face.* . . . The cause of death was brain death due to blunt head trauma. The pathologist also noted numerous contusions to the head from blunt force trauma, subdural hematomas, and numerous [injuries] to the head and face due to forceful trauma."[2] (Italics added.)

The district attorney charged Fakalata, Ngaloafe, and appellant with Martinez's murder. The cases were severed for trial. After Ngaloafe reached a plea bargain and Fakalata was convicted of first degree felony murder, appellant's case proceeded to trial. The prosecutor argued that Martinez was killed during a robbery and urged the jury to convict appellant of first degree felony murder. The jury found him not guilty of felony murder but guilty of second degree murder, as well as robbery and battery. The court sentenced him to a prison term of 38 years to life.

This court affirmed. Appellant's main contention on appeal was that the trial court abused its discretion by excluding testimony from a witness named Faasolo, who would have testified that his cousin Paul Toki had admitted, before he died in 2005, that he was the unidentified fourth assailant, and he

---

[2] Expert testimony conflicted somewhat as to the cause of death. The prosecution expert testified that when Martinez fell and hit his head after the initial punch, the injury was "devastating" and could by itself have proven fatal, but the expert believed that further injuries caused by the blows inflicted as Martinez lay on the ground also contributed to causing death, though he could not say with certainty. A defense expert testified that, while it was "conceivable" that injuries caused by the later blows causally contributed to death, Martinez "was not going to survive" the initial injury caused by the fall.

threw the punch that led to Martinez's death. We held that the trial court erred in excluding the testimony, but the error was harmless for several reasons, including that the jury could have found appellant guilty as an aider and abettor even if it believed Faasolo.

Ten years later—after the 2018 enactment of Senate Bill No. 1437, but before the 2021 amendments—appellant filed a form section 1170.95 petition asserting that (1) an information had been filed against him "that allowed the prosecution to proceed under a theory of . . . murder under the natural and probable consequences doctrine," (2) that he had been convicted at trial of "2nd degree murder pursuant to the . . . natural and probable consequences doctrine," and (3) that he "could not be convicted of . . . 2nd degree murder because of changes made" by Senate Bill No. 1437. (See § 1170.95, subd. (a).) He requested counsel.

At a brief initial hearing, the court appointed counsel, and the district attorney's office submitted a copy of the appellate record and made an oral motion for summary dismissal of the petition on the ground that appellant was convicted as the actual killer, making him ineligible for relief under section 1170.95. Appellant filed a written opposition contending that "(1) it was always disputed and never resolved who threw the . . . fatal punch; (2) [his] conviction was affirmed on appeal on grounds that he was liable as an aider and abettor, and (3) the instructions . . . allowed the jury to convict [him] on [an] aiding and abetting [theory] and . . . to 'impute' malice to [him] without finding him to have personally had malice."

The trial court summarily denied the petition after concluding that the jury had found appellant guilty as the actual killer. In response to the insistence of appellant's lawyer that the instructions had not required the jury to find that appellant threw the fatal punch, the court said, "It's in the opinion

on page 2: 'Appellant then punched Miguel Martinez directly in the face, causing Miguel to fall to the ground, landing on his back, and striking the rear of his head on the sidewalk.' [¶] . . . [¶] [I]t's basically saying he did it." Appellant filed a timely notice of appeal.

## Discussion

Senate Bill No. 1437 transformed the law of accomplice liability for murder by " 'amend[ing] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder . . . .' " (*People v. Gentile* (2020) 10 Cal.5th 830, 842 quoting Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill No. 775 expanded the scope of those changes to encompass, among other things, murder convictions "under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime.*" (§ 1170.95, subd. (a), as amended by Stats. 2021, ch. 551, § 2, new text italicized.)[3] Because the jury found appellant not guilty of felony murder, the relevant aspect of Senate Bill Nos. 1437 and 775 is their effect on liability for second degree murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime.

In *Gentile*, issued before the 2021 amendments, our Supreme Court described the law of aiding and abetting, including the natural and probable consequences doctrine, as follows: "Our law recognizes two forms of liability for aiders and abettors. [Citation.] First, under direct aiding and abetting

---

[3] In December 2021, we requested supplemental briefs on the applicability and effect of the amendments made by Senate Bill No. 775, which took effect on January 1, 2022. The Attorney General did not dispute that the amendments apply to this case since the appeal would be pending when they took effect.

principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' [Citation.] [¶] Second, under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*People v. Gentile, supra*, 10 Cal.5th at p. 843.)

The court held that Senate Bill No. 1437 limited the natural and probable consequences doctrine as follows: "In [2014], we held that natural and probable consequences liability cannot extend to first degree premeditated murder [in accord with] 'reasonable concepts of culpability.' [¶] In 2018, the Legislature enacted Senate Bill No. 1437 . . . after [finding] further 'need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides.' [Citation.] Senate Bill 1437 amended . . . section 188 to provide that '[e]xcept as stated in [the felony-murder statute], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.' [Citation.] . . . [¶] We hold that Senate Bill 1437 bars a conviction for second degree murder under the natural and probable consequences theory." (*People v. Gentile, supra*, 10 Cal.5th at pp. 838–839, citing § 188, subd. (a)(3).) That theory, the court observed, "authorizes precisely what Senate Bill 1437 forbids: it allows a fact finder to impute malice 'to a person based solely on his or her participation in a crime.' " (*Gentile, supra*, at p. 847.) The court added, however, that "an aider and abettor who does not expressly intend to aid a killing can still be convicted

6

of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Id.* at p. 850.)

Current law thus provides that the actual killer, or a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder. In this case, the trial court treated this court's opinion in *Langi I* as conclusively establishing that the jury found appellant guilty as the actual killer. Although understandable in view of explicit statements in this court's prior opinion, the trial court erred in treating those statements as conclusive. The Supreme Court's subsequent decision in *Lewis, supra*, 11 Cal.5th 952, held that although an appellate opinion affirming a conviction may be considered in determining whether a prima facie showing has been made under section 1170.95, on prima facie review such an opinion may not be conclusive. "While the trial court may look at the record of conviction . . . to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry . . . is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] [A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' [Citations.] [¶] Appellate opinions . . . are generally considered to be part of the record of conviction. (See *People v. Woodell* (1998) 17 Cal.4th 448, 454–455.) However, as we cautioned in *Woodell*, the probative value of

7

an appellate opinion is case-specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' (*Id*. at p. 457.)[4] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] . . . [T]he 'prima facie bar was . . . set very low.' " (*Lewis*, *supra*, at pp. 971–972.)

Despite the statement in our prior opinion that appellant threw the punch leading to the victim's death, for which the record does include evidence, the record as a whole leaves room to question that conclusion. The opinion in *Langi I* does not identify any express finding that appellant threw the fatal punch, any uncontroverted evidence establishing that fact, or any concession by appellant of its truth. That question was not critical to the resolution of the appeal; the critical question was whether it was reasonably likely that Faasolo's improperly excluded testimony would have led to a different outcome at trial.[5] As the case was tried, the jury could have found appellant guilty as an aider and abettor even if it found that someone else threw the fatal punch. The jury was not required to find, and did not necessarily find, that it was appellant who threw that punch. Read with the caution dictated

---

4 *Woodell* addressed whether and how a court may consider an out-of-state appellate opinion affirming a prior criminal conviction when assessing whether that out-of-state conviction qualifies as a strike under California law. (*People v. Woodell*, *supra*, 17 Cal.4th at pp. 450–451, 454.)

5 We held that "[t]he evidence of appellant's guilt [as the actual killer] was particularly compelling"; that Faasolo's credibility was unlikely to have withstood cross-examination; and that even if it had, and his testimony "had persuaded the jury that Toki . . . , and not appellant, . . . delivered the fatal blow," such a finding "would not have absolved appellant of guilt" because "each of the defendants [could have been] convicted under an aiding and abetting theory."

by *Lewis*, the prior opinion does not conclusively establish that appellant was convicted as the actual killer.[6]

Assuming the jury found appellant guilty of murder as an aider and abettor, the question becomes whether it could have done so "under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1170.95, subd. (a).) Appellant contends that, while the court gave no instruction expressly based on the natural and probable consequences doctrine, the standard instructions were ambiguous and permitted the jury to find him guilty on a theory under which malice was imputed to him based solely on his participation in the crime.[7]

Two instructions are of central significance. CALJIC No. 8.31, as given to the jury, stated that a killing is a second degree murder if "1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to

---

[6] Similarly, while our opinion referred to the initial punch without qualification as "the fatal blow" or "the lethal blow" (and above we have again referred to the "fatal blow"), there was in fact conflicting evidence on the cause of death at trial and no factual finding on the issue. Hence, our opinion cannot be read to establish conclusively that the initial punch was the sole cause of death.

[7] In his petition and initial briefing, filed before Senate Bill No. 775 was enacted, appellant necessarily relied solely on his claim that the instructions permitted the jury to find him guilty on a natural and probable consequences theory. Because of the subsequent expansion of the statute, we focus now on the broader "other theory under which malice is imputed to a person based solely on that person's participation in a crime" standard added to section 1170.95 by Senate Bill No. 775.

prove that the defendant intended that the act would result in the death of a human being." CALJIC No. 3.01, as given to the jury, stated that "A person aids and abets the commission . . . of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, . . . [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime."[8]

Appellant contends the instructions permitted the jury to find him guilty of murder if it found that (1) the killing resulted from the actual killer's intentional act; (2) appellant aided and abetted that intentional act; and (3) the killer "deliberately performed [the act] with knowledge of the danger to, and with conscious disregard for, human life"—whether or not *appellant* knew of or consciously disregarded the danger to human life. The instructions thus permitted the jury to impute malice to appellant based solely on his participation in a crime, without having to find that he personally acted with malice. (§ 1170.95, subd. (a), as amended by Stats. 2021, ch. 551, § 2.)

The Attorney General argues that the jury could have found appellant guilty as an aider and abettor of second degree murder only if it found that he "kn[e]w and share[d] the murderous intent of the actual perpetrator." (*People v. Offley* (2020) 48 Cal.App.5th 588, 595–596.) He argues that the jury could not have found appellant guilty on a "theory under which malice is imputed to a person based solely on that person's participation in a crime" because it was "instructed that to convict appellant of murder it had to find that he acted

---

[8] CALJIC No. 3.00, as given to the jury, added that "Each principal [in a crime], regardless of the extent or manner of participation[,] is equally guilty. Principals include: [¶] 1. Those who directly and actively commit . . . the act constituting the crime, [¶] or [¶] 2. Those who aid and abet the commission . . . of the crime."

with implied malice."[9] But the instruction does not make any such plain statement. The Attorney General quotes the part of the aiding-and-abetting instruction stating that an accomplice must act with "the intent or purpose of committing or encouraging or facilitating the commission of the crime." (CALJIC No. 3.01.) That language does not state that the aider and abettor must himself have known that the act he aided was life-threatening, or that he must himself have acted with indifference to human life. In the context of the full instructions that were given, there is no reason to conclude that the jury found that to be true of appellant's state of mind.

As explained in *People v. Powell* (2021) 63 Cal.App.5th 689, 712–714 (*Powell*), the standard aiding-and-abetting instructions are ill suited to the crime of second degree murder. If, as here, a trial court uses such an instruction without tailoring it to the specifics of that crime, the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice.[10]

---

[9] The Attorney General also argues, in response to appellant's original, pre–Senate Bill No. 775 theory, that the jury cannot have found him guilty under the natural and probable consequences doctrine because the court gave no instruction framed in terms of that doctrine. Because of the expanded reach of Senate Bill No. 775, it is unnecessary to address that contention. None of the decisions the Attorney General cites in support of that argument addresses the issue raised in this appeal.

[10] A passage quoted by the Attorney General from *People v. Offley*, *supra*, 48 Cal.App.5th 588, states that Senate Bill No. 1437 "did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder." (*Id.* at p. 595.) While true, before the enactment of Senate Bill No. 1437, there was "a dearth of decisional law on aiding and abetting implied malice murder," attributable to "the heretofore availability of the natural and probable consequences doctrine for second degree murder," which was "much easier to prove . . . than . . . direct aider and abettor liability for an implied malice murder." (*Powell*, *supra*, 63 Cal.App.5th at

The aiding-and-abetting instruction stated that a person aids and abets a crime if he or she acts "*with knowledge of the unlawful purpose of the perpetrator*, and . . . with the intent or purpose of committing or encouraging or facilitating the commission of the crime." (CALJIC No. 3.01, italics added.) However, as noted above, the second-degree-murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death. Thus, while the perpetrator must have deliberately performed the fatal act "with knowledge of the danger to, and with conscious disregard for, human life" (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had "murderous intent," certainly the aider and abettor need not have had such an intent. Although the definition of second degree murder in CALJIC No. 8.31 states that the perpetrator must have acted with conscious disregard for human life, the definition of an aider and abettor in CALJIC No. 3.01 does not include the same requirement. Thus, under the instructions that were given, the jury was entitled to conclude that, to be guilty as an aider and abettor of second degree murder, appellant need only have intended to encourage the perpetrator's intentional act—in this case, punching Martinez—whether or not appellant intended to aid or encourage Martinez's

---

p. 711, fn. 26.) *Powell* clarifies the precise elements of directly aiding and abetting a second degree implied-malice murder, and points out that the use of an untailored, standard aiding-and-abetting instruction fails to convey those elements. (*Id.* at pp. 712–714.) Thus, while Senate Bill No. 1437 did not alter the law regarding direct aiding and abetting of second degree murder, it did bring out the inadequacy of standard aiding-and-abetting instructions in this context.

killing, and whether or not he personally knew of and disregarded the risk of such a killing.[11]

The instructions should have explained that, to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice. (*Powell, supra*, 63 Cal.App.5th at pp. 713–714.) More precisely, as *Powell* holds, the accomplice must have aided the perpetrator's commission of the life-endangering act while "personally harbor[ing]" the mental state of implied malice. (*Id.* at p. 713.) That mental state includes "knowledge that the perpetrator intended to commit the [life-endangering] act, intent to aid the perpetrator in the commission of the act, and knowledge that the act is dangerous to human life, and . . . conscious disregard for human life." (*Ibid.*, italics omitted.) The standard aiding-and-abetting instruction given in *Powell*, a CALCRIM instruction identical in relevant substance to the CALJIC instruction used here (see *id.* at pp. 706–707, citing CALCRIM No. 401), was inadequate as applied to the crime of second degree murder because it did not clarify that an accomplice must personally harbor that mental state of implied malice. (*Id.* at p. 714.)[12]

---

[11] The likelihood of such a misunderstanding is increased by the statement in CALJIC No. 3.31, also given to the jury, that "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator," with no mention of the mind of an aider and abettor.

[12] *Powell* was a direct appeal from a pre–Senate Bill No. 437 conviction, not an appeal from the denial of a section 1170.95 petition. (*Powell, supra*, 63 Cal.App.5th 689.) The court held that the instructional error was harmless because section 1170.95, as it then read, did not apply to cases pending on direct appeal, and the appellant had almost surely been convicted not as a direct aider and abettor pursuant to the flawed instructions, but on a natural and probable consequences theory that was valid under pre–Senate Bill No. 1437 law. (*Id.* at p. 714.) The court expressed no view on the outcome of a possible future section 1170.95 petition. (*Id.* at p. 711, fn. 25.)

Similarly, nothing in the standard aiding-and-abetting instruction given here states that the accomplice himself must have acted with such knowledge and conscious disregard.[13]

Because the record of conviction does not conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted "with knowledge of the danger to, and with conscious disregard for, human life" (CALJIC No. 8.31), an evidentiary hearing is required. At that hearing, the court may find that appellant was the actual killer or that he was an aider and abettor who facilitated the killing with personal disregard for human life, in which case his petition will be denied. If the prosecution fails to prove that he was either, he will be entitled to relief.

### Disposition

The order denying the petition is reversed. The matter is remanded with directions to issue an order to show cause and hold an evidentiary hearing as specified in this opinion.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
DESAUTELS, J.[*]

---

[13] In 2010, three years after appellant's trial, the CALJIC committee amended CALJIC No. 3.00, which defines "principals," by adding text for use if the crime charged is murder. (Use Note to CALJIC No. 3.00 (2010 rev.) (7th ed. 2005).) The new text begins: "[T]he aider and abettor's guilt is determined by the combined acts of all the participants *as well as that person's own mental state*." (*Ibid.*, italics added.)

[*] Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judge: | Honorable Clifford V. Cretan |
| Counsel for Defendant and Appellant: | Sandra Gillies |
| Counsel for Plaintiff and Respondent: | Rob Bonta<br>Attorney General of California<br>Lance E. Winters<br>Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br>Catherine A. Rivlin<br>Supervising Deputy Attorney General<br>Bruce M. Slavin<br>Deputy Attorney General |